# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
ERIC JACOBS                    :    Civil Action No. 05-0428(NLH)
and LUCRITA JACOBS,            :
                               :
          Plaintiffs,          :
                               :
     v.                        :    OPINION
                               :
CITY OF BRIDGETON,             :
et al.,                        :
                               :
          Defendants.          :
```

**APPEARANCES:**

Troy A. Archie, Esquire
Old Firehouse #6
339 Front Street
Suite A
Camden, NJ 08102
*Attorney for Plaintiffs*

Richard Goldstein, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin, PA
Woodland Falls Corporate Park
200 Lake Drive East
Suite 300
Cherry Hill, NJ 08002
*Attorneys for Defendants City of Bridgeton, Jeffery Wentz,
Officer Torres, Officer Stanton, DSG Giamari, and Officer
Flilpello*

Randall B. Weaver, Esquire
Office of the NJ Attorney General
R.J. Hughes Justice Complex, PO Box 116
Trenton, NJ 08625
*Attorney for Defendant FNU Parenti*

Betsy G. Ramos, Esquire
Michelle L. Corea, Esquire
Capehart & Scatchard
8000 Midlantic Drive - C.S. 5016, Suite 300
Mount Laurel, NJ 08054
*Attorneys for Defendant Cumberland County Prosecutor's Office*

**HILLMAN**, District Judge

## I.  INTRODUCTION

This matter has come before the Court on the Defendants'
motions for summary judgment on Plaintiffs' civil rights and
state law claims against them.  Plaintiffs have not opposed these
motions.  For the reasons expressed below, Defendants' motions
will be granted.

## II.  BACKGROUND

Plaintiffs, Eric Jacobs and Lucretia Jacobs, filed a
Complaint against Defendants pursuant to 42 U.S.C. § 1983
claiming that Defendants violated their rights under the Fourth,
Fifth and Fourteenth Amendments to the U.S. Constitution.
Plaintiffs also assert numerous state law claims.

According to their Complaint, on January 22, 2003,
Defendants Officer Torres, Officer Stanton, and Sergeant Giamari
came to the Jacbos's home located at 751 Irving Avenue,
Bridgeton, New Jersey and arrested Mr. Jacobs for "eluding an
officer with motor vehicle, and resisting arrest."  As he was
exiting his home, Plaintiffs claim that these Defendants "punched
and interrogated" Mr. Jacobs, despite Mr. Jacobs' repeated
denials regarding any knowledge of driving a vehicle.  Plaintiffs
claim that they informed the officers that Mr. Jacobs's family
could confirm that he was sleeping in the house and not driving a
vehicle.  Plaintiffs also claim that another person was driving

2

the vehicle, but the officers disregarded the information, continued the arrest, and placed Mr. Jacobs in jail.

Mr. Jacobs was transported to the Cumberland County Jail, where he remained until he was able to make bail. Criminal charges were filed against Mr. Jacobs by the Defendant Cumberland County Prosecutor's Office ("CCPO") and the Bridgeton Police Department. Plaintiffs claim that the CCPO and the Bridgeton Police Department refused to dismiss the charges "even after receiving conclusive evidence showing that Mr. Jacobs was not driving such vehicle." On January 27, 2003, Plaintiffs claim that Mrs. Jacobs spoke to Defendant Sergeant Flilpello to inform him that she had been in bed with Mr. Jacobs at the time when he was accused of driving the vehicle. Plaintiffs claim that Sgt. Flilpello told her that she was lying and "verbally abused her," telling her that he was going to prosecute her also. The charges against Mr. Jacobs were dismissed on July 1, 2004.

As a result of Defendants' conduct, Plaintiffs allege that they were subject to unreasonable search and seizure and they were not provided with equal protection. Plaintiffs also allege that the City of Bridgeton and the Cumberland County Prosecutor's Office failed to properly train and supervise their employees. Plaintiffs also assert claims pursuant to New Jersey state law for negligence, assault, intentional infliction of emotional distress, false imprisonment, false arrest, reckless disregard to

3

the rights of Plaintiffs, loss of consortium, and a violation of New Jersey's Law Against Discrimination.

### III.  UNDISPUTED FACTS[1]

Documents and deposition testimony obtained through the discovery process supplement the incidents described in Plaintiffs' Complaint.  According to the police report filed by Officer Torres after Mr. Jacobs's arrest, on the evening of January 22, 2003 he and Officer Stanton were on patrol for the City of Bridgeton Police Department in a marked patrol vehicle. The officers observed a red vehicle, a Chevrolet Cavalier, make a left turn, and when the vehicle passed, they noticed that the left rear tail light was broken.  Torres, who was driving the patrol car, followed the vehicle as it proceeded through two stop signs without stopping.  Torres activated the emergency lights, and while he was notifying dispatch that he was attempting to

---

[1]According to Magistrate Ann Marie Donio's October 3, 2005 Scheduling Order [docket no. 10], discovery was due by January 30, 2006, and dispositive motions were due by May 15, 2006. Defendant Cumberland County Prosecutor's Office filed its motion for summary judgement [docket no. 12] on March 14, 2006. Defendants City of Bridgeton, Jeffery Wentz, Norberto Torres, Stanton, Giamari, and Flilpello filed their motion for summary judgment [docket no. 13] on May 12, 2006.  Defendant Parenti filed his motion for summary judgment [docket no. 14] on May 16, 2006.  Pursuant to Local Civil Rule 7.1(d)(2), Plaintiffs' opposition to the latest-filed motion for summary judgment was due June 2, 2006.  Plaintiffs have not filed an opposition to any of these motions.  Because Defendants' three motions for summary judgment are unopposed, the Court will "treat all facts properly supported by the movant[s] to be uncontroverted."  Brandon v. Warden, No. State Prison, 2006 WL 1128721, *3 (D.N.J. 2006).

stop the vehicle, the vehicle crossed the double yellow lines into the lane of oncoming traffic when turning a corner.  Torres continued pursuit, traveling at 35 mph, and shone his spot lamp onto the vehicle.  He observed that the driver was a thin build black male wearing a black winter cap and a red sweater.  When the driver turned at another corner, he turned his head and Torres observed that the driver had a medium skin complexion. The driver then sped through another stop sign while making a turn, and increased his speed to 65 mph.  During radio contact with dispatch, the officers were informed by Sergeant Branch to stop pursuit.

Earlier that day, Detective Sergeant (DSG) Giamari of the Bridgeton Police Department and DSG Parenti of the New Jersey State Police had received a tip from a confidential informant of a possible retaliatory gang shooting at a bar in Cumberland County.  During Officers Torres and Stanton's pursuit of the red vehicle, the DSGs were on patrol in Giamari's unmarked, undercover vehicle taking part in the operation to prevent the gang shooting.  A minute after Officers Torres and Stanton stopped their pursuit of the red car, Giamari radioed to them that he and Parenti had just observed a vehicle behind them turn off its headlights and turn into a residential driveway.  They found a red vehicle abandoned at the rear of 715 Irving Avenue. Sergeant Branch permitted Officers Torres and Stanton to proceed

to that location.

A man, later identified as Eric Jacobs, came out from the side of the house and inquired about what they were doing in his yard.  According to Mr. Jacobs's deposition testimony, he had been getting ready for bed when he saw a light coming towards his bedroom window.  He lifted the curtain, saw a car driving past his window going around the back of his house, and asked his wife why someone was driving in the backyard.  Mr. Jacobs threw on a red shirt, jeans, and a pair of boots, and went out the side door of his house and observed two vehicles in his yard, which was only half illuminated by light.  Mr. Jacobs walked out from the unlit side of the yard and observed a red car in front of a gray car.  He also saw two people in plain clothes, one on either side of the red car, and immediately recognized them to be police officers.  Mr. Jacobs spoke first and asked them why they were in his yard.  According to Mr. Jacobs, the officers asked him who the red car belonged to, and he replied that he did not know.

According to the police reports, DSG Giamari identified himself as an officer and commanded Mr. Jacobs to stop and get onto the ground because he was unknown to the officers.  Mr. Jacobs admitted in his deposition testimony that he did not comply with the order.  The police reports confirm that Mr. Jacobs did not get onto the ground, and he ignored four or five additional commands to get on the ground.  Mr. Jacobs testified

that when Giamari then drew his weapon, he finally complied with the order, got on his knees on the ground, and was handcuffed by Giamari.  Mr. Jacobs also related that Giamari, assisted by DSG Parenti, led him by his arm around to the front of the house, where he observed eight to ten police cars.

When Officers Torres and Stanton arrived at the scene, they found DSG Giamari holding Mr. Jacobs.  Officer Torres identified Mr. Jacobs as the man he saw driving the red vehicle.  According to both Mr. Jacobs's deposition testimony and Torres's police report, Mr. Jacobs became irate when he was identified as being the driver of the vehicle, began yelling at Torres, and ignored Torres's repeated commands to get into his police car.  Both Mr. Jacobs and Officer Torres also acknowledge that Torres struck Mr. Jacobs once in the stomach with a closed fist and told him to sit down.  Mr. Jacobs testified that he continued arguing with Torres and still refused to get into the vehicle.  Officer Torres then struck Mr. Jacobs in the stomach again, this time slightly harder.  Mr. Jacobs finally complied and got into the vehicle.

Officer Torres transported Mr. Jacobs to police headquarters in Bridgeton.  Mr. Jacobs received four citations for a broken taillight, reckless driving, failure to keep right, and failure to stop or yield.  He was also charged with resisting arrest and eluding the police.  He was never searched or patted down at the police station or at his home.  Mr. Jacobs spent no more than an

7

hour at the station, and was never held in a cell.  He also was not required to post bail.

The next day, Officer Torres, who was continuing the investigation, spoke with the Jacobs' friend, Antoinette Nelson. Nelson told Torres that it was her son, Darryl Nelson, who was the person driving the red car, not Mr. Jacobs.  A few days later, on January 29, 2003, Officer Torres was informed by the public defender's office that Mr. Jacobs' oldest son, Ceron, allowed Darryl into the basement when he was running from the police.  Darryl then ran into the woods.  On February 8, 2003, Officer Torres spoke with Ceron, who stated that he had let Darryl into the basement after he parked his red car in the Jacobs's yard.  Ceron also informed Torres that Ceron was wearing a red sweater.  Officer Torres then spoke with Mr. Jacobs and asked him to take a lie detector test because Torres believed that he had arrested the right person despite the contradictory information he had been receiving.  Mr. Jacobs stated that he would not take a lie detector test.

At the same time Officer Torres was continuing his investigation, on February 5, 2003, Mrs. Jacobs called the New Jersey State Police and spoke to DSG Blaker.  She related the incident, and DSG Blaker followed up with his supervisor, who wrote Mrs. Jacobs a letter informing her that the Cumberland County Prosecutor's Office had been notified and that the State

Police would take no further action.  This is the only
communication Mrs. Jacobs had with the State Police.

With regard to Defendant Cumberland County Prosecutor's
Office, Mrs. Jacobs testified that she does not recall ever
contacting the CCPO regarding this incident and that she did not
follow up with the CCPO once a lawyer was retained to represent
Mr. Jacobs.  Mrs. Jacobs also testified that she never filed a
written complaint with the CCPO regarding this incident.

On or about July 1, 2004, all charges, including the traffic
citations, were dismissed against Mr. Jacobs.

## IV.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied
that "the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ.
P. 56(c).

Initially, the moving party has the burden of demonstrating
the absence of a genuine issue of material fact.  Celotex Corp.
v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has
met this burden, the nonmoving party must identify, by affidavits
or otherwise, specific facts showing that there is a genuine

9

issue for trial.  Id.  Thus, to withstand a properly supported
motion for summary judgment, the nonmoving party must identify
specific facts and affirmative evidence that contradict those
offered by the moving party.  Anderson, 477 U.S. at 256-57.  A
party opposing summary judgment must do more than just rest upon
mere allegations, general denials, or vague statements.  Saldana
v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

     In circumstances where a nonmoving party fails to oppose the
motion, Fed. R. Civ. P. 56(e) provides that the court may only
grant the moving party's motion for summary judgment "if
appropriate."  A moving party's motion is appropriately granted
when that party is entitled to judgment as a matter of law, and
the court "will accept as true all material facts set forth by
the moving party with appropriate record support."  See Anchorage
Assocs. v. V.I. Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir.
1990).

     **B.   Analysis**

     In order to determine whether Defendants are entitled to
judgment as a matter of law on Plaintiffs' claims against them,
the twelve counts in Plaintiffs' Complaint must be analyzed for
each of the eight Defendants using the undisputed facts above.
Because, however, Plaintiffs have not opposed Defendants' motions
and have not submitted any evidence to support that there is a
genuine issue of fact which would preclude summary judgment,

10

Plaintiffs' claims against most of the Defendants can be quickly disposed of.

1. ***Claims against the Cumberland County Prosecutor's Office, the City of Bridgeton, Chief Jeffery Wentz, Officer Stanton, Officer Flilpello and DSG Parenti***

Plaintiffs assert the same eleven claims against the Cumberland County Prosecutor's Office, the City of Bridgeton, Chief Jeffery Wentz, Officer Stanton, Officer Flilpello and DSG Parenti: 1) conspiracy to violate Plaintiffs' constitutional rights secured by the Fourth, Fifth, and Fourteenth Amendments (First Count); 2) unreasonable search and seizure (Second Count); 3) denial of equal protection under the law because their actions were motivated by racial animus (Third Count); 4) negligence (Fifth Count); 5) assault (Sixth Count); 6) intentional infliction of emotional distress (Seventh Count); 7) false imprisonment (Eighth Count); 8) false arrest (Ninth Count); 9) furnishing false information (Tenth Count); 10) loss of consortium (Eleventh Count); and 11) violation of New Jersey's Law Against Discrimination (Twelfth Count). Plaintiffs have also asserted a claim for failure to train and supervise (Fourth Count) against the Cumberland County Prosecutor's Office and the City of Bridgeton.

Other than the "mere allegations" in their Complaint, Plaintiffs have failed to provide any evidence to support any of

11

these claims against any of these Defendants.[2]  Consequently,
based on the undisputed facts, summary judgment must be entered
in their favor.

### 2. *Claims against DSG Giamari and Officer Torres*

Except for the failure to train and supervise claim,
Plaintiffs have also asserted the same counts against DGS Giamari
and Officer Torres as against the other Defendants.  With regard
to Plaintiffs' state law claims, they fail because Plaintiffs did
not comply with the notice requirements and the tort claim

---

[2]Because the record is devoid of any evidence that these
Defendants' limited or tangential contact with Plaintiffs even
remotely constituted constitutional or state law violations, the
Court will refrain from reciting the elements of each claim.  For
Plaintiffs' constitutional claims, it should be noted, however,
that the Cumberland County Prosecutor's Office has absolute
immunity from civil suits for damages for deprivation of civil
rights brought under 42 U.S.C. § 1983, Imbler v. Pachtman, 424
U.S. 409, 431 (1976), as well as suits brought under state law,
see N.J. Stat. Ann. 59:2-2(b), 3-3, 3-8.  It should also be noted
that a municipality, such as the City of Bridgeton, can only be
directly sued under § 1983 where action pursuant to a municipal
policy or custom causes a constitutional tort.  See Fagan v. City
of Vineland, 22 F.3d 1283, 1291 (3d Cir. 1994).

For Plaintiffs' state law claims, it should be noted that
they are subject to the New Jersey Tort Claims Act (NJTCA), which
expressly bars recovery against public employees and public
entities if the notice procedures are not met, see N.J. Stat.
Ann. 59:8-3, Velez v. City of Jersey City, 850 A.2d 1238, 1243
(N.J. 2004), although "[c]auses of action alleging intentional
torts against public employees that accrued prior to June 29,
2004, are not required to adhere to the notice of claim
provisions." Davis v. Township of Paulsboro, 371 F. Supp. 2d
611, 619 (D.N.J. 2005) (citing Ptaszynski v. Uwaneme, 853 A.2d
288 (App. Div. 2004)).  If the notice requirement is met, or if
it is not applicable, in order for a plaintiff to recover for
pain and suffering, the plaintiff must have suffered permanent
injury or disfigurement and his medical expenses must exceed
$3,600.  See N.J. Stat. Ann. 59:9-2(d).

threshold of the New Jersey Tort Claims Act.[3]  Plaintiffs' claim
under the New Jersey Law Against Discrimination also fails
because Plaintiffs have not presented any evidence that they were
not provided with the opportunity to "obtain all the
accommodations, advantages, facilities, and privileges of any
place of public accommodation . . . without discrimination
because of race . . . ."  N.J. Stat. Ann. 10:5-12(f)(1).

Plaintiffs' claim for conspiracy to violate their
constitutional rights secured by the Fourth, Fifth, and
Fourteenth Amendments fails as well.  Allegations of conspiracy
may form the basis of a § 1983 claim, but "a plaintiff must
allege specific facts showing an agreement and concerted action
amongst the defendants," and "conclusory allegations of
conspiracy are insufficient to state a valid § 1983 claim."
Harmon v. Delaware Secretary of State, 154 Fed. Appx. 283, 285
n.3 (3d Cir. 2005) (citing Tonkovich v. Kansas Bd. Of Regents,
159 F.3d 504, 533 (10th Cir. 1998)) (other citations omitted).
Thus, to state a § 1983 claim for conspiracy, "a plaintiff must
allege the specific conduct violating his or her rights, the time
and place of that conduct, and the identity of the responsible
officials."  Id. citing (Oatess v. Sobolevitch, 914 F.2d 428, 431
n.8 (3d Cir. 1990)).  Here, Plaintiffs have failed to allege any
facts to substantiate an allegation of conspiracy.

---

[3]See note 2, supra.

Plaintiffs' remaining claims against Giamari and Torres for denial of equal protection and unreasonable search and seizure also fail.  The qualified immunity analysis provides the basis to determine whether a claim for a constitutional violation by a law enforcement officer is viable.  The standard promulgated by the Third Circuit is as follows:

> Qualified immunity protects law enforcement officers from being tried for actions taken in the course of their duties.  If the immunity applies, it entitles the officer to be free of the 'burdens of litigation.' But the immunity is forfeited if an officer's conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.' To determine ... whether the officers have lost their immunity, we must engage in a two step analysis. First, we must decide 'whether a constitutional right would have been violated on the facts alleged····'. ... Second, if we believe that a constitutional violation did occur, we must consider whether the right was "clearly established."  The question is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' This is an objective inquiry, to be decided by the court as a matter of law.

Doe v. Groody, 361 F.3d 232, 238 (3d Cir. 2004)(citations omitted).

With regard to Plaintiffs' equal protection claim, Plaintiffs have failed to establish that Giamari and Torres denied them equal protection under the law because their actions were motivated by racial animus.  In order to establish a claim under the Equal Protection Clause, Plaintiffs need to prove that the actions of the officers (1) had a discriminatory effect and

14

(2) were motivated by a discriminatory purpose.  See Bradley v. U.S., 299 F.3d 197, 205 (3d 2002).  There is no evidence in the record that the officers' interaction with Mr. Jacobs was in any way altered because of his race.  Indeed, Mr. Jacobs testified that none of the officers used racial slurs or otherwise referred to Mr. Jacobs's ethnicity.  Without any evidence of racial animus, there can be no claim that Giamari and Torres did not provide Plaintiffs with equal protection.

As for Plaintiffs' unreasonable search and seizure claim, Plaintiffs have also failed to establish that their rights were violated.  The United States Supreme Court has explained the analysis of a Fourth Amendment claim for unreasonable search and seizure:

> The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government . . . . Because the "balance between the public interest and the individual's right to personal security[]" tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity " 'may be afoot.'
>
> When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.  This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." Although an officer's reliance on a mere "'hunch'" is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required

15

for probable cause, and it falls considerably short of
satisfying a preponderance of the evidence standard.

    Our cases have recognized that the concept of
reasonable suspicion is somewhat abstract. But we have
deliberately avoided reducing it to " 'a neat set of
legal rules[]'". In <u>Sokolow</u>, for example, we rejected
a holding by the Court of Appeals that distinguished
between evidence of ongoing criminal behavior and
probabilistic evidence because it "create[d]
unnecessary difficulty in dealing with one of the
relatively simple concepts embodied in the Fourth
Amendment."

<u>U.S. v. Arvizu</u>, 534 U.S. 266, 273-274 (2002) (internal quotations

and citations omitted); <u>see also</u> <u>Devenpeck v. Alford</u>, 543 U.S.

146, 152-53 (2004) ("In conformity with the rule at common law, a

warrantless arrest by a law officer is reasonable under the

Fourth Amendment where there is probable cause to believe that a

criminal offense has been or is being committed. Whether probable

cause exists depends upon the reasonable conclusion to be drawn

from the facts known to the arresting officer at the time of the

arrest.").

    Here, Plaintiffs' only explanation of their claim for

unreasonable search and seizure is contained in their Complaint:

"The action of defendants were done to deprive plaintiffs of

their rights to be secure in their person against unreasonable

searches and seizures and freedom from arrest, except upon

probabl[e] cause." (Compl. ¶ 27.)  From this general claim, it

appears as though Plaintiffs are arguing that the contact Giamari

and Torres had with Plaintiffs constituted an unreasonable search

and seizure.  It is undisputed that Mr. Jacobs was never

16

searched.  Thus, only Plaintiffs' unreasonable "seizure" claim
must be analyzed.

Giamari's only contact with Mr. Jacobs was ordering him
repeatedly, with gun drawn, to get onto the ground when he
emerged from the unlit side of his home, asking him who owned the
car, handcuffing him, and walking him to the front of the house.
Giamari had no contact with Mrs. Jacobs.  Torres's contact with
Mr. Jacobs consisted of Torres striking Mr. Jacobs in the stomach
twice because Mr. Jacobs was yelling at Torres and ignoring
Torres's repeated demands that Mr. Jacobs get into his police
car.[4]  Torres did not have any contact with Mrs. Jacobs.

Without any argument to the contrary, and viewing the
totality of the circumstances, Giamari's and Torres's conduct in
"seizing" Mr. Jacobs was not unreasonable because they both had a
particularized and objective basis for suspecting that he was
involved with legal wrongdoing.  With regard to Giamari, it was
reasonable to order to the ground and handcuff an unknown person
who had emerged from a dark area where a car that had just eluded
police was parked.  Torres's conduct was also reasonable.  While
on patrol, he had observed a thin build black man in a red shirt
driving a red car which had eluded police at a high rate of
speed.  Once he arrived at the Jacobs's residence, he again

---

[4]Plaintiffs have not made a claim that Torres's use of force
was excessive.

17

observed a thin build black man in a red shirt, who Torres
identified as the man who had been driving the red car.  Torres's
efforts to effect an "irate" suspect's compliance with his order
to get into the police vehicle were reasonable under the
circumstances.   As a result, Giamari and Torres maintain their
qualified immunity on Plaintiffs' constitutional violation
claims.

**V.**     **<u>CONCLUSION</u>**

　　　For the reasons expressed above, all Defendants are entitled
to summary judgment on all of Plaintiffs' claims against them.
An appropriate Order will issue.


Dated: <u>December 4, 2006　</u>        <u>s/ Noel L. Hillman　　　　　</u>

At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.

18